**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| M.C.W., on behalf of herself and all others similarly situated; | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | Civil Action No. 3:22-cv-01506-M |
| BLUE CROSS AND BLUE SHIELD OF TEXAS, a division of Health Care Service Corporation; | § § § § | |
| Defendant. | § § | |

**SECOND AMENDED ERISA CLASS ACTION COMPLAINT**

Plaintiff M.C.W. asserts, to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**INTRODUCTION AND NATURE OF THIS ACTION**

1.      Plaintiff M.C.W. challenges Defendant Blue Cross and Blue Shield of Texas's denial of coverage for services provided to her son, A.W., at a licensed residential treatment center. First, Blue Cross's denial, based on a purported lack of medical necessity, is an abuse of discretion. Second, in making medical necessity determinations for mental health care, Blue Cross used criteria more restrictive than the criteria used to determine medical necessity for medical/surgical claims, violating the plan's promise of parity in its coverage of mental health benefits and thereby breaching its fiduciary duties to Plaintiff and other insureds.

2.      Blue Cross promises parity in its treatment of mental health care but in fact subjects mental health care to a higher standard of medical necessity than medical/surgical care. By failing

to follow the terms of the plan by providing mental health benefits in parity, Blue Cross has violated ERISA.

3.     With this action, Plaintiff seeks benefits improperly denied, declaratory and injunctive relief, plus interest and attorneys' fees.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law.

5.     Venue is appropriate in this judicial district because Plaintiff resides in this district, Defendant Blue Cross Blue Shield of Texas has consented to jurisdiction in this district, and the breaches described here occurred within this judicial district.

6.     Consistent with 29 U.S.C. § 1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

7.     Plaintiff M.C.W., at all material times, resided in Dallas, Texas. M.C.W. is a retired employee of Texas Instruments Incorporated. Both she and A.W. are covered under the Texas Instruments Retiree Health Benefits Plan (the "Plan"). A copy of the Plan's summary plan description ("SPD") is attached to this Complaint at Exhibit A. This document was available to Plaintiff before this lawsuit commenced. Since the lawsuit commenced, Blue Cross has produced an internal plan document ("Internal Plan Document"). It is attached at Exhibit B.

8.     M.C.W. and her son A.W. are participants in the Plan as set forth in Article III of the Internal Plan Document.

9.     Because this is a private employer-sponsored plan, the Plan is governed by ERISA.

10.    A.W. executed a power of attorney confirming M.C.W.'s authority to pursue the

claims in this action on his behalf.

11.    Because of the intensely private nature of the medical services rendered that will be discussed here, this Second Amended Complaint uses initials instead of the names of Plaintiff and her son.

12.    Defendant Blue Cross and Blue Shield of Texas, a division of Health Care Service Corporation, a Mutual Legal Reserve Company, is part of a family of companies operating Blue Cross Blue Shield plans in Illinois, Montana, New Mexico, Oklahoma and Texas. Blue Cross and Blue Shield of Texas operates at 1001 East Lookout Drive, Richardson, Texas, in Collin County. Defendant has been appointed as Claims Administrator for Plaintiff's ERISA-regulated health insurance plan and adjudicates all mental health and substance abuse claims. *See* Ex. A at 136; Ex. B § 14.1. In this Complaint, "Blue Cross" refers to the named Defendant and all parent, subsidiary, successor, predecessor, and related entities to which these allegations pertain.

13.    In light of its central role in the mental health and substance abuse-related claim adjudication process, and as the appointed "claims fiduciary," *see* Ex. B § 14.1, Blue Cross is an ERISA fiduciary as defined by 29 U.S.C. § 1104(a). As such, it is legally required to discharge its duties "solely in the interest of the participants and beneficiaries" and for the "exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *Id.* It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. *Id.*; *see* Ex. B § 14.1 ("Notwithstanding any eligibility Claims and appeals, the plan sponsor grants to each of the Claims Administrators the discretion to interpret, construe and apply this Plan in administering Claims and appeals under this Plan. The Claims Administrator shall be the claims fiduciary and shall make the final decision on all Claim appeals.").

SECOND AMENDED ERISA CLASS ACTION COMPLAINT                                    PAGE 3

14. As a fiduciary, Blue Cross owes a duty of loyalty to plan participants and beneficiaries.

## FACTS

### A. Coverage Promises

15. Plaintiff's Plan covers services that are 1) medically necessary, 2) delivered by an eligible provider, and 3) covered under the Plan. Ex. A at 36.

16. Medically necessary expenses under the Plan are defined as "those services, supplies and procedures which are necessary for the diagnosis, care or treatment of an illness and which are determined to be widely accepted professionally in the U.S. as effective, appropriate, and essential, based on recognized standards of the health care specialty involved. . . . Illness means any kind of bodily or mental disorder." *Id.* The Internal Plan Document has no defined coverage terms.

17. Under the general heading "Behavioral Health Care," the Plan, as set forth in its SPD, covers a wide variety of illness and diagnoses, including psychological problems, prescription drug abuse, alcohol abuse and addiction, mental illness, family/relationship concerns, parenting issues/concerns, stress, depression or anxiety, illegal drug abuse or addiction, elder care issues/concerns, and eating disorders. *Id.* at 48. Benefits are not separately set forth in the Internal Plan Document.

18. The Plan promises parity in its treatment of mental health and medical/surgical treatment. Specifically, the Plan provides:

> The BCBS HDHP and PPO options provide for mental health parity in accordance with the law. As a result, on a classification by classification basis, financial requirements and restrictions applied to medical and surgical benefits are not more favorable than those applied to behavioral health care benefits (including co-pays, deductibles, out-of-pocket maximums and limitations applied to treatments).

*Id.* at 49.

19. In 2020, M.C.W. and A.W. were enrolled in the Blue Cross PPO plan. In 2021,

M.C.W. and A.W. were enrolled in the Blue Cross HDHP plan.

## B.  A.W.'s Mental Health History

20.    A.W. has suffered from mental health issues since adolescence. He is diagnosed with major depressive disorder, generalized anxiety disorder, ADHD, and cannabis use disorder.

21.    In February 2016, when A.W. was in seventh grade, he rode his bike to the top of an eight-story parking garage and threatened to jump. A.W. was immediately enrolled in a six-week teen suicide prevention program, during which he attempted again to commit suicide by hanging himself.

22.    In December 2019, a friend of A.W.'s committed suicide. A.W. fell into a deep depression, could not sleep well at night, and slept much of the days. He refused to see a therapist. A.W.'s substance use increased, and he abused cannabis, LSD, ADHD medications, and alcohol.

23.    On February 15, 2020, M.C.W. called the police because A.W. was saying he wanted to kill himself, throwing furniture, and punching holes in the wall. Later that month, A.W. twice ran out of the house in the middle of the night when experiencing high anxiety. A.W.'s parents began staying up with A.W. at night out of fear that he would hurt himself.

24.    On February 27, 2020, at the recommendation of A.W.'s behavioral health providers, A.W. was admitted for treatment at BlueFire Wilderness, an Idaho-licensed wilderness therapy program located in south-central Idaho. BlueFire provides, among other things, cognitive behavioral therapy, experiential therapy, and dialectical behavior therapy. Therapy at BlueFire is provided in individual, group, and family settings.

25.    A.W. was treated at BlueFire from February 27, 2020 to May 21, 2020.

26.    While being treated at BlueFire, in April 2020, A.W. underwent a psychological evaluation. The psychologist recommended that after BlueFire, A.W. be placed in a residential

therapeutic setting.

27. A.W.'s lead therapist at BlueFire indicated that A.W. would "not be ready to return to 'normal life' after" BlueFire, because there was "concern that he could easily return to drug use as an escape and [he] needs more therapy and practice at coping with the stresses of life before returning to a regular home/school environment."

### C. Blue Cross Denies Prior Authorization for Residential Treatment

28. After completing treatment at BlueFire, A.W. was admitted at Telos Residential Treatment Center, LLC, a Utah-licensed residential behavioral health treatment center located in Orem, Utah. At the time of his admission, A.W. was diagnosed with Cannabis Use Disorder (F12.10); Neurodevelopmental Disorder (F88); Attention-Deficit/hyperactivity disorder (F90.0); Generalized Anxiety Disorder (F41.1); and Major Depressive Disorder (F33.1). At Telos, A.W. received individual, group, and family therapy addressing those conditions and disorders.

29. A.W.'s treating providers at Telos determined residential treatment was medically necessary, based in part on a psychological evaluation and A.W.'s history of serious behavioral health challenges, including self-harm, multiple major depressive episodes, and substance use. Residential treatment was necessary because his providers determined he needed a 24-hour structured setting. Specifically, he needed residential treatment to access substance use treatment, attend individual and group therapy, manage anxiety and depression, develop healthy coping skills, develop skills to build healthy relationships, and have access to a supportive peer culture.

30. A.W. was 17 years old on May 22, 2020, the date he was admitted to Telos. A.W. resided at Telos while he received mental health care. Telos is in Utah, and A.W. was a minor when he began treatment. His home was in Dallas, Texas with his parents. A.W.'s medical records reveal hourly bed checks overnight when he was at Telos. A.W.'s treatment at Telos was

residential.

31.    Prior to A.W.'s admission, Telos initially attempted to obtain authorization from Blue Cross for A.W.'s residential treatment, but Blue Cross denied the prior authorization request. However, Blue Cross indicated to Telos's billing office staff that it would consider authorizing A.W.'s treatment at the partial hospitalization level of care. Partial hospitalization is a lower level of care and was not recommended by A.W.'s treating providers because it does not provide 24-hour care. Blue Cross deprived M.C.W. of a full and fair review of its denial of the prior authorization request for treatment at the residential level of care for A.W. at Telos.

32.    Based on Blue Cross's representation that it would consider authorizing treatment at the partial-hospitalization level, Telos then attempted to obtain authorization for A.W.'s treatment for partial hospitalization, which has a lower daily rate. Blue Cross approved twenty days of treatment at Telos at the partial hospitalization rate.

### D.  A.W.'s Treatment at Telos

33.    A.W. was treated at Telos from his admission on May 22, 2020 through his discharge on April 14, 2021.

34.    After initially approving treatment, Blue Cross denied coverage for A.W.'s treatment at Telos for dates of service after June 10, 2020, because it determined A.W.'s treatment at Telos was not medically necessary. On appeal—which challenged the medical necessity determination and Blue Cross's failure to provide parity in its treatment of mental health care—Blue Cross upheld the decision, again based on A.W.'s treatment not being medically necessary.

35.    Blue Cross's decision was not supported by substantial evidence because A.W.'s treatment at Telos was medically necessary under the Plan for his entire treatment.

36.    On June 18, 2020, A.W. described pre-relapse symptoms of drawing images of drugs

and discussing substances with peers.

37. On June 30, 2020, a Telos staff member observed A.W. on top of a peer, repeating, "Hit me again you fucker" and then attempting to physically pick up the peer. Two staff members attempted verbally and physically to separate A.W. and the peer.

38. On July 1, 2020, and August 8, 2020, A.W. was involved in two more physical altercations with peers that required staff involvement.

39. On September 4, 2020, A.W. reported worsening depression, disturbed sleep, ongoing depression, lower energy, drive, and motivation.

40. On October 30, 2020, A.W. shared in therapy at Telos that he was experiencing vivid, distressing dreams connected to death.

41. Throughout his treatment at Telos, A.W. experienced continuing symptoms such as significant sleep difficulties that affected his ability to attend school, numbness, cloudy thoughts, feeling consistently depressed, intention to continue using substances post-treatment, and challenging relationships both with his parents—including at least one "high conflict" visit with his mom—and peers, including inappropriate sexual talk.

42. On March 22, 2021, Kyle Barth, L.M.F.T, A.W.'s primary therapist at Telos, noted that A.W. needed to continue "receiving a high level of care." A.W. had relapsed on February 7, 2021, and since that date, had "reported an intention to continue to use cannabis after treatment, heightened frustration, anxiety, rigidity, . . . disengagement. . . . [and] symptoms of depression . . . includ[ing] depressed mood and fatigue." Barth wrote, "[A.W.] is at a transition stage of life. Where [he] does not currently have employment, not enrolled in school, has communicated plans to return to substance use, symptoms of depression are currently being observed, and considering his executive function deficits and neurodevelopmental disorder the stressors associated with

transitional period cannot be [over]stated." Barth noted that "[d]ecreasing level of care too quickly provides a significant risk."

43.   A.W. was discharged from Telos on April 14, 2021.

### E.   Blue Cross's Denials of A.W.'s Treatment at Telos

44.   On May 21, 2021, Blue Cross issued its final coverage denial for services rendered through January 14, 2021, at Telos.

45.   Blue Cross identified its appeal decision as being for dates of service June 18, 2020, through January 14, 2021, for a total claim amount of $195,700. But M.C.W. had appealed Blue Cross's denial of services for June 11 to June 17, 2020, as well. The total amount of the denied claims M.C.W. appealed is actually $207,100.

46.   Blue Cross's explanation for its denial on May 21, 2021, was as follows:

You did not want to harm yourself or others. You were in touch with reality. Your mood and anxiety symptoms had improved. You were medically stable. You had social support. You were able to care for yourself well enough. You could have continued to get better and work on communication skills and coping skills in a lower level of care. You had access to a lower level of care. From the information provided, you could have been safely treated in a less intensive setting such as Mental Health Intensive Outpatient.

47.   Blue Cross's May 21, 2021 denial stated that the denial was based on a medical necessity review, "[p]er the medical necessity provision of your benefit plan."

48.   In its denial, Blue Cross purported to quote from the "Definition Section" of M.C.W.'s "Benefit Booklet" for its definition of medically necessary/medical necessity, stating:

> Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:
> - required to diagnose or treat an illness, injury, disease or its symptoms;
> - in accordance with generally accepted standards of medical practice;
> - clinically appropriate in terms of type, frequency, extent, site and duration;
> - not primarily for the convenience of the patient, Physician or other health care provider; and

- rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting.

49. This is not the definition of medically necessary from the SPD. In fact, the SPD does not have a "Definition Section." The SPD's definition of medically necessary is broader than the language quoted in Blue Cross's May 21 denial; there, "medically necessary" is defined as "those services, supplies and procedures which are necessary for the diagnosis, care or treatment of an illness and which are determined to be widely accepted professionally in the U.S. as effective, appropriate, and essential, based on recognized standards of the health care specialty involved. . . . Illness means any kind of bodily or mental disorder." Ex. A at 36.

50. Specifically, the SPD does not include the requirement that services be "rendered in the least intensive setting that is appropriate for the delivery of the services and supplies."

51. Although Blue Cross applied a definition of medical necessity for A.W.'s mental health treatment that required services to be "rendered in the least intensive setting that is appropriate for the delivery of the services and supplies," the Plan does *not* require services to be "rendered in the least intensive setting that is appropriate for the delivery of the services and supplies" to qualify as medically necessary in the medical or surgical context.

52. In its denial, Blue Cross also identified that its determination was based on the "MCG care guidelines Partial Hospital Behavioral Health Level of Care (Child/Adolescent) Guidelines 23rd Edition."

53. These Milliman Care Guidelines further restrict the definition of medically necessary for mental health claim adjudication. The table below shows the Milliman Care Guidelines' restrictions on the definition of medically necessary specifically for partial hospitalization, compared to the Plan's definition of medically necessary:

SECOND AMENDED ERISA CLASS ACTION COMPLAINT                                    PAGE 10

| **Milliman Guidelines** | **SPD** |
|---|---|
| All of the following:<br><br>1.  Patient risk or severity of behavioral health disorder is appropriate to proposed level of care as indicated by 1 or more of the following:<br>  • Danger to self for child or adolescent<br>  • Danger to others for child or adolescent<br>  • Behavioral health disorder is present and appropriate for partial hospital program care with all of the following:<br>    ○ Moderate Psychiatric, behavioral, or other comorbid conditions for child or adolescent<br>    ○ Moderate dysfunction in daily living for child or adolescent<br>2.  Treatment services available at proposed level of care are necessary to meet patient needs and 1 or more of the following:<br>  • Specific condition related to admission diagnosis is present and judged likely to further improve at proposed level of care<br>  • Specific condition related to admission diagnosis is present and judged likely to deteriorate in absence of treatment at proposed level of care<br>  • Patient is receiving continuing care (e.g., transition of care from more or less intensive level of care).<br>3.  Situation and expectations are appropriate for partial hospital program for child or adolescent as indicated by all of the following:<br>  • Recommended treatment is necessary, appropriate, and not feasible at lower level of care<br>  • Patient is willing to participate in treatment voluntarily (or at direction of parent or guardian)<br>  • There is no anticipated need for physical restraint or other involuntary control<br>  • There is no  need for around-the-clock medical or nursing care<br>  • There has been no recent attempt or current plan to seriously harm another<br>  • There has been no recent suicide attempt or act of serious harm to self, or there has been sufficient relief of precipitants of any such of any such action<br>  • There is no current plan for suicide or serious | Medically necessary expenses are those services, supplies and procedures which are necessary for the diagnosis, care or treatment of an illness and which are determined to be widely accepted professionally in the U.S. as effective, appropriate, and essential, based on recognized standards of the health care specialty involved. |

| | |
|---|---|
| harm<br>• Patient's family, caregiver, guardian, or other available resources can adequately monitor patient condition when away from partial hospital program (i.e., partial hospital program resources are sufficient to address any inadequacies in support system)<br>• Patient, family, caregiver, or guardian will contact care provider if current plan for suicide or serious harm develops<br>• Patient has sufficient ability to respond as planned to individual and group therapeutic interventions<br>• Biopsychosocial stressors have been assessed and are absent or manageable at proposed level of care (e.g., any identified deficits can be managed by program directly or through alternative arrangements). | |

54.   The Plan does not identify guidelines for medical/surgical care that similarly restrict the definition of medically necessary.

55.   During the internal appeal process, M.C.W. raised allegations that Blue Cross failed to provide benefits in parity. But in its denial, Blue Cross did not address this.

56.   Blue Cross did not identify to M.C.W. how the mental health guidelines described above have comparable treatment limitations in the medical or surgical context. Each factor described in the guidelines imposes a unique limitation on mental health treatment, and Blue Cross never identified any comparable limitation for any factor in the medical or surgical context.

57.   The Plan promises that "on a classification by classification basis" "restrictions applied to medical and surgical benefits are not more favorable than those applied to behavioral health care benefits (including co-pays, deductibles, out-of-pocket maximums and limitations applied to treatments)." SPD at 49. But Blue Cross applied less favorable restrictions to behavioral health care benefits with its more restrictive standard of "medically necessary."

58. The SPD does not identify any medical/surgical classification to which Blue Cross applies a similarly restrictive definition of medically necessary. Regardless of whether Blue Cross classifies the treatment A.W. received while residing at Telos as inpatient or outpatient, the SPD does not apply a similarly restrictive standard of medically necessary to the likely inpatient analogue (skilled nursing facility care) or the likely intensive outpatient analogue (home health care).

59. By using a more restrictive standard for "medically necessary" in adjudicating mental health claims than in adjudicating medical/surgical claims, contrary to the Plan's promise of parity, Blue Cross breached its fiduciary duty and violated the terms of its Plan.

60. Blue Cross breached its fiduciary duty under ERISA by failing to keep the Plan's promise of parity in its treatment of mental health and medical/surgical benefits, applying a list of specific limitations in the mental health context without comparable limitations in the medical/surgical context.

61. Further, under either definition of medically necessary, Blue Cross abused its discretion when it denied coverage for A.W.'s treatment at Telos as not medically necessary after June 10, 2020.

62. Despite the specific findings of A.W.'s providers that supported the medical necessity of treatment at Telos, Blue Cross denied A.W.'s coverage request.

63. The May 21, 2021 denial concluded Blue Cross's mandatory internal appeal process. All conditions required before commencing suit have been met. Plaintiff is an ERISA participant in the Blue Cross plan; all premiums and associated charges for coverage have been paid; Blue Cross's internal appeals process is exhausted; Plaintiff paid for and is otherwise responsible for $195,700 for the medically necessary services rendered at Telos.

64.   Blue Cross has waived all coverage defenses that it did not raise in the internal appeals process.

## CLASS CLAIMS

65.   Plaintiff brings her claim for injunctive relief individually and on behalf of the **Parity Class**, which is as follows:

> All persons who, during the class period, were (1) covered under any ERISA-governed health benefit plan insured and/or administered by Blue Cross that provides coverage for mental or behavioral health, nervous disorders, or substance abuse care; (2) whose plans provided for mental health parity with medical/surgical treatment under the same or similar language as the SPD here; and (3) whose mental health claims were denied by Blue Cross based on standards of medical necessity more restrictive than standards of medical necessity used to adjudicate medical or surgical services coverage requests.

66.   The class period extends back two years from the date of the commencement of this action.

67.   Membership in the proposed class is so numerous that individual joinder of all class members is impracticable except by means of a class action. The disposition of the claims in a class action will benefit both the parties and the Court.

68.   Plaintiff's claims are typical of all other class members. Plaintiff, like all other class members, did not receive coverage for mental or behavioral health treatment due to Defendant's practice of denying claims for mental health care based on a medical necessity protocol that is more restrictive than medical necessity protocols applied to medical/surgical care.

69.   Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the class, and Plaintiff is a member of the class that she seeks to represent.

70.   Plaintiff will adequately represent the class because she has interests in common with the proposed class members and Plaintiff has retained attorneys who are experienced in class

action litigation.

71.    Common questions of law and/or fact predominate over any questions affecting only individual members of the class. Common questions include, but are not limited to, the following:

- whether Blue Cross denied mental health claims based on standards of medical necessity more restrictive than standards of medical necessity used to adjudicate claims for medical or surgical services;
- whether Blue Cross's coverage protocols to determine medical necessity for mental health care are more restrictive than standards used to determine medical necessity for medical or surgical care;
- whether Blue Cross's use of coverage protocols that are more restrictive for mental health care than protocols for medical or surgical care violates its coverage obligations.

72.    The prosecution of separate actions by individual members of the class would create a risk of (1) inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for Defendant; and (2) adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not party to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests.

73.    The class action method is appropriate for the fair and efficient prosecution of this action.

74.    Individual litigation of all claims that might be asserted by all members of the class would produce a multiplicity of cases that would burden the federal judicial system. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising out of the conduct of this Defendant.

75.    The certification of the above class would allow litigation of claims that, in view of the expense of the litigation, may be an insufficient amount to support separate actions.

---

**SECOND AMENDED ERISA CLASS ACTION COMPLAINT**                    **PAGE 15**

**COUNT I**
**Individual Claim for Benefits Under 29 U.S.C. § 1132 (a)(1)(B)**

76.   Plaintiff realleges and incorporates paragraphs above as if fully set forth.

77.   Plaintiff's claim is brought under 29 U.S.C. § 1132(a)(1)(B).

78.   Plaintiff has a standing to assert claims "to recover benefits due . . . under the terms of [the] plan" and to "clarify . . . rights to future benefits under the terms of the plan," as authorized by 29 U.S.C. § 1132(a)(1)(B).

79.   Blue Cross's determination that A.W.'s treatment was not medically necessary was arbitrary and capricious because Blue Cross's decision relied upon language that was not in the SPD. Blue Cross's reliance on non-existent plan language was an abuse of discretion.

80.   Further, under the actual plan language governing medical necessity, Blue Cross's determination that A.W.'s treatment was not medically necessary was an arbitrary and capricious action that resulted in an abuse of discretion. A.W.'s treatment records clearly demonstrate that treatment at Telos was medically necessary as defined by the Plan, and thus there was not a rational connection between the known facts about A.W.'s condition and the decision that Blue Cross made. Therefore, Blue Cross's decision was not supported by substantial evidence.

81.   Further, in making its medical-necessity determination, Blue Cross did not follow the Plan's promise of parity in mental health and medical/surgical treatment in its determination of A.W.'s coverage by adding requirements to "medically necessary" for mental health treatment that it did not add for medical/surgical treatment.

82.   Even under the more restrictive standard for "medically necessary" that Blue Cross wrongfully uses in the mental health context, A.W.'s treatment at Telos was medically necessary.

**COUNT II**
**Claim for Declaratory Relief on Behalf of the Parity Class**
**Under 29 U.S.C. § 1132 (a)(1)(B)**

83.     Plaintiff realleges and incorporates paragraphs above as if fully set forth.

84.     ERISA allows participants "to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

85.     Blue Cross made claim determinations regarding A.W.'s treatment at Telos, and the treatment of members of the Parity Class, pursuant to a standard for medical necessity for mental health care that is more restrictive than the standard for medical necessity under which Blue Cross makes claim determinations for medical/surgical care. This violates the Plan's promises of parity.

86.     Blue Cross promises to "provide for mental health parity in accordance with the law. As a result, on a classification by classification basis, financial requirements and restrictions applied to medical and surgical benefits are not more favorable than those applied to behavioral health care benefits (including co-pays, deductibles, out-of-pocket maximums and limitations applied to treatments)."

87.     Plaintiff's second claim is for the Court to clarify her rights, and the rights of the Parity Class, to future benefits under the terms of plans administered by Blue Cross that promise parity.

88.     Specifically, Plaintiff and the Parity Class are entitled to a declaration that Blue Cross may not apply a more restrictive definition of medical necessity or apply more a restrictive protocol for medical necessity to adjudicate claims for mental health benefits than it uses to adjudicate claims for medical/surgical benefits.

**COUNT III**
**Claim for Breach of Fiduciary Duty on Behalf of the Parity Class**
**Under 29 U.S.C. § 1132 (a)(3)**

89.    Plaintiff realleges and incorporates paragraphs above as if fully set forth.

90.    Plaintiff's third claim is for breach of fiduciary duty for failing to operate the Plan for the exclusive purpose of providing benefits to plan beneficiaries and for failing to follow plan documents. It is brought on behalf of the Plaintiff and on behalf of the **Parity Class** under 29 U.S.C. § 1132(a)(3).

91.    Plaintiff has standing to assert claims "to enjoin any act or practice which violates [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3).

92.    Blue Cross makes claims determinations for mental health treatment that utilize a more restrictive standard of medically necessary than Blue Cross uses to make claims determinations for medical/surgical treatment. This violates the terms of the Plan, which promises that "on a classification by classification basis, financial requirements and restrictions applied to medical and surgical benefits are not more favorable than those applied to behavioral health care benefits (including co-pays, deductibles, out-of-pocket maximums and limitations applied to treatments)."

93.    Plaintiff and members of the Parity Class had benefits wrongly denied as a result of Blue Cross's breaches of its fiduciary duties and, to remedy the breaches, they are entitled to an injunction requiring Blue Cross to comply with the promise of parity in plans it administers and to make determinations on mental health claims pursuant to a standard of medically necessary that is not more restrictive than the standard of medically necessary it uses to adjudicate medical/surgical claims.

**WHEREFORE**, Plaintiff requests the following:

1. An order requiring Blue Cross to pay M.C.W. $207,100 for services rendered between June 11, 2020 and January 14, 2021, at Telos;

2. A declaration that Plaintiff's and the class's rights to benefits include Blue Cross providing parity in its treatment of claims for mental health and medical/surgical benefits, and making claims determinations for mental health treatment pursuant to a definition of medically necessary that is not more restrictive than the definition of medically necessary it uses to make claims determinations for medical/surgical treatment;

3. An injunction requiring Blue Cross to cease its practice of making claims determinations for mental health treatment pursuant to a more restrictive definition of medically necessary than it uses to make claims determinations for medical/surgical treatment; and

4. Any and all other relief related to this action, including payment of reasonable fees, costs, and interest where permitted by law.

DATED: February 10, 2023.

Respectfully submitted,

By: */s/ Meagan Martin Powers*

Meagan Martin Powers
Texas Bar No. 24050997
**MARTIN POWERS & COUNSEL, PLLC**
600 E. John Carpenter Fwy., Suite 234
Irving, TX 75062
Telephone: (214) 612-6471
Fax: (214) 247-1155
meagan@martinpowers.com

Jordan Lewis (*pro hac vice*)
Florida Bar No. 97997
**JORDAN LEWIS, P.A.**
4473 N.E. 11th Avenue
Fort Lauderdale, FL 33334
Telephone: (954) 616-8995
Fax: (954) 206-0374
jordan@jml-lawfirm.com

David W. Asp (*pro hac vice*)
Minnesota Bar No. 0344850
Jennifer L. M. Jacobs (*pro hac vice*)
Minnesota Bar No. 0328753
Derek C. Waller (*pro hac vice*)
Minnesota Bar No. 0401120
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
dwasp@locklaw.com
jlmjacobs@locklaw.com
dcwaller@locklaw.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on February 10, 2023, a true and correct copy of the above and foregoing document was served electronically upon all counsel of record through electronic service.

*/s/Meagan Martin Powers*
Meagan Martin Powers
